## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| ANTHONY J. PIPITO | : CIVIL ACTION |
|---|---|
| | : |
| v. | : NO. 18-4885 |
| | : |
| LOWER BUCKS COUNTY JOINT | : |
| MUNICIPAL AUTHORITY, *et al.* | : |

## MEMORANDUM

**KEARNEY, J.**                                          **July 24, 2019**

Amid months of back-and-forth acrimony with his co-workers at a wastewater treatment facility arising from investigated claims he harassed his co-workers, Anthony J. Pipito sued his employer Lower Bucks County Joint Municipal Authority and the facility's managing director claiming the managing director's July 2018 memorandum addressed to him alone confirming procedures to avoid recurring employee disputes restricts his protected speech as to matters of public concern under the First Amendment. Two months before suing, Mr. Pipito characterized the July 2018 memorandum as disciplinary relating to his work conduct in a filing with Pennsylvania regulators. He turned around and filed this case, recharacterizing the absence of repeating the phrase "at work" in the same July 2018 memorandum restricts his protected speech. He then engaged in protected speech without an adverse effect.

As Mr. Pipito swore to Pennsylvania authorities, the July 2018 memorandum is an employee misconduct reminder addressed to his workplace conduct amidst charges of his harassing co-workers. He demanded the written memorandum after meetings directing his workplace conduct upon his return from an extended leave. We cannot read the Authority's failure to repeat the phrase "at work" in the July 2018 memorandum as restricting protected speech on matters of public concern. He also fails to show an injury-in-fact as he continued to speak out on

matters of public concern without reprimand. In the accompanying Order, we grant the Authority's and the facility's managing director's motion for summary judgment and deny Mr. Pipito's cross-motion for summary judgment.

## I. Undisputed Facts[1]

Lower Bucks County Joint Municipal Authority ("Authority) hired Anthony J. Pipito as a certified waste water operator at a wastewater treatment facility in February 2007 (the "Facility").[2] Mr. Pipito continues to work at the Facility. His job duties include monitoring, maintaining and communicating issues regarding the Facility to Leonard Rodak.[3]

### *The Facility's Employee Handbook.*

The Facility maintains a Policy and Procedures Handbook ("Employee Handbook").[4] Mr. Pipito received a copy of the Employee Handbook when hired in 2007.[5] The Employee Handbook contains: (1) a Civility Policy; (2) a Harassment Policy; and (3) a Whistleblower Policy.

The Civility Policy provides "[t]he Authority believes a work environment should be a place where mutual respect is practiced and reinforced. This Policy is designed to promote an environment in which all employees will be treated with respect and expect the same in return. This type of respect is referred to as civility. The best way to promote civility is to practice it on a daily basis. The Authority is committed to civility at work through education, training and discipline when necessary. The Authority does not intend this Policy to deprive any employee of his or her right to appropriate self-expression. Rather, it seeks to maintain an environment in which people can feel safe, secure and continue to grow in their occupation. The Authority expects all administrative/supervisory personnel, Board Directors, as well as all employees, to practice civility even in the most difficult circumstances. All employees shall communicate with each other and with members of the community with professionalism and mutual respect. It is the Authority's

2

position that rude, abusive or intolerant behavior pollutes the work environment and that disrespect shall be addressed when it occurs and discipline will be imposed when and if necessary."[6]

The Harassment Policy provides "[t]he Authority prohibits all forms of illegal harassment of employees by managers, fellow employees, employees of outside vendors or visitors. The Authority will not tolerate harassment of its employees. Any form of harassment related to an employee's race, color, sex, religion, national origin, age, physical or mental disability, or marital or veteran status is a violation of this policy and will be treated as a disciplinary matter. For these purposes, the term 'harassment' includes, but is not necessarily limited to, slurs, jokes, or other verbal, graphic, or physical conduct relating to an individual's race, color, sex, religion, national origin, age, physical or mental disability, or marital or veteran status. ..."[7] The Harassment Policy provides employees with a procedure to complain about harassment.[8]

The Whistleblower Policy provides "[t]he Authority encourages all employees including Supervisors, acting in good faith, to report suspected or actual wrongful conduct. ..."[9] "Wrongful conduct" is defined as "[a] serious violation of Authority policy; a violation of applicable state and federal laws; ..."[10]

### *Mr. Pipito's 2014 termination and successful Union grievance.*

In May 2014, the Authority terminated Mr. Pipito for conduct in handling a wastewater overflow.[11] The Facility's procedures required Mr. Pipito notify Mr. Rodak of the overflow.[12] Mr. Rodak in turn notified the Facility's Managing Director Dr. Vijay Rajput who directed him to notify Pennsylvania's Department of Environmental Protection.[13] Dr. Rajput investigated the overflow incident and recommended the Authority's Board of Directors terminate Mr. Pipito's employment.[14] The Board of Directors terminated Mr. Pipito's employment effective May 28, 2014.[15]

3

Mr. Pipito is a member of United Automobile Aircraft and Agricultural Workers of America (the "Union").[16] Mr. Pipito filed a grievance with the Union, and, after a hearing, an arbitrator found the Authority did not have just cause to terminate Mr. Pipito and reduced his discipline to a fifteen-day suspension.[17]

Nearly two years later, in March 2016, the Department of Environmental Protection filed a petition against Mr. Pipito to suspend his waste water operator license resulting from the overflow incident.[18] Mr. Rodak testified as a witness at the hearing before the Department of Environmental Protection, but Dr. Rajput did not.[19] After the hearing, the Department concluded Mr. Pipito "committed misconduct in violation of the Water and Wastewater Systems Operators' Certification Act by failing to use reasonable care and professional judgment in the performance of his duties as a certified wastewater operator" with regard to the May 2014 overflow incident, but his misconduct "does not justify his suspension as a certified wastewater operator."[20]

### *Mr. Rodak submits a harassment complaint to the Authority against Mr. Pipito in November 2017.*

On November 3, 2017, Mr. Rodak submitted a complaint reporting an encounter with Mr. Pipito on the evening of November 2, 2017.[21] Mr. Rodak complained Mr. Pipito accused him of failing to call the Department of Environmental Protection regarding an overflow incident.[22] When Mr. Rodak responded no overflow incident had been reported to him, Mr. Pipito accused Mr. Rodak of being part of a "cover up."[23] After learning from another employee heavy rain water caused some type of overflow, Mr. Rodak notified the Department of Environmental Protection.

The same day, Mr. Pipito again approached Mr. Rodak regarding the overflow and Mr. Rodak told Mr. Pipito to "stay away from me and stay out of my business."[24] In response, Mr. Pipito yelled an obscenity to Mr. Rodak, freely admitting he told Mr. Rodak to "go suck a d***."[25]

4

Mr. Pipito testified he used this language with Mr. Rodak in response to Mr. Rodak telling Mr. Pipito to either "stay the f*** out of [Mr. Rodak's] business" or "go f*** myself."[26]

Mr. Rodak complained he "[has] tried to avoid contact with [Mr. Pipito] since he returned from being fired. I was assured by this company and the [Department of Environmental Protection] that there would be no repercussions at my work place after I testified against [Mr. Pipito] in court. I will not put up with [Mr. Pipito's] foul language, his hostile attacks or his false accusations about me and my job involving the [Department of Environmental Protection]."[27] At his deposition, Mr. Pipito admitted using obscene language with Mr. Rodak, but testified both of them used foul language as "another way of exchanging pleasantries with each other."[28]

After receiving Mr. Rodak's harassment complaint, Dr. Rajput—who viewed Mr. Rodak's complaint as "complaining of harassment by [Mr. Pipito] in violation of the Authority's Civility Policy"— directed Michael Andrews,[29] to obtain statements from Mr. Pipito and other witnesses.[30] Dr. Rajput spoke with both Mr. Pipito and Mr. Rodak. Dr. Rajput told Mr. Pipito the incident with Mr. Rodak is the subject of investigation, instructed Mr. Pipito to avoid contact with Mr. Rodak unless required to perform work duties at the Facility, and the Authority would take appropriate action as necessary.[31]

### *Mr. Pipito meets with Mr. Andrews on March 27, 2018.*

Mr. Pipito took a medical leave on December 18, 2017 and remained out of work until March 2018.[32] On March 27, 2018, Mr. Pipito met with Mr. Andrews at Dr. Rajput's direction.[33] Mr. Andrews memorialized his meeting with Mr. Pipito in a memorandum addressed to Dr. Rajput.[34] Mr. Andrews' memorandum described the purpose of the meeting as to discuss Mr. Pipito's return to work and the Authority's notice of "hostility and harassment claim towards him."[35] Mr. Andrews noted he told Mr. Pipito "there shall be no contact with Lenny Rodak ...

5

other than what is required in his operator duties" and "any [Facility] personnel or human resources questions/concerns are to be given directly to [Mr. Andrews]."[36]

Mr. Pipito also took notes of his meeting with Mr. Andrews.[37] Mr. Pipito testified he asked Mr. Andrews about a "civility charge" relating to Mr. Rodak's use of foul language.[38] Mr. Pipito asked Mr. Andrews to "reduce to writing allowable interactions with [Mr.] Rodak."[39] Mr. Pipito testified Mr. Andrews told him to "have no contact with [Mr.] Rodak" because of Mr. Rodak's charge against Mr. Pipito. Mr. Pipito testified he "want[ed] everything in writing now so they can't toss me out on the street for some other made-up charge."[40]

### *Mr. Appleton submits a harassment complaint to the Authority against Mr. Pipito in June 2018.*

On June 15, 2018, Walter Appleton, Mr. Pipito's co-worker, filed a written harassment complaint with the Authority regarding Mr. Pipito.[41] Mr. Appleton alleged harassment by Mr. Pipito "for years" and "in the last few weeks" reported Mr. Pipito "mock[ing]" him for "not going to his trial" (presumably referring to the 2016 hearing before the Department of Environmental Protection); blaming Mr. Appleton for "the bosses finding out about [Mr. Pipito's paperwork issues]"; and calling Mr. Appleton, as well as Mr. Rodak, a "rat."[42] Mr. Appleton complained he "[has] endured this long enough," asked to "have no further contact ... of any kind" with Mr. Pipito including "working overtime on my shift," and demanded the Authority "prevent [Mr. Pipito] from harassing me and provide a safe work environment."[43]

### *Mr. Pipito meets with Dr. Rajput on June 16, 2018.*

After receiving Mr. Appleton's complaint, Dr. Rajput and Phillip Smythe, a Field Technician and Supervisor, met with Mr. Pipito on June 16, 2018.[44] Dr. Rajput and Mr. Pipito both made notes of their meeting.[45] Dr. Rajput allowed Mr. Pipito to read Mr. Appleton's

6

complaint and reminded Mr. Pipito of Mr. Rodak's complaint.[46] Dr. Rajput's noted "[i]n light of" Mr. Appleton's and Mr. Rodak's complaints, he "instructed [Mr. Pipito] not to have any contact with [Mr. Appleton] except in an emergency situation and/or as in the [Standard Operating Procedures]" and "also directed not to have any contact with [Mr. Rodak], except for Plant operation issues."[47] Dr. Rajput's notes reflect he told Mr. Pipito to "please refrain from making any remarks pertaining to [Mr. Rodak and Mr. Appleton] to any employees while on the Authority's premises" and "reiterated that we all need to comply with the Authority's Civility Policy" and "any and all [Facility] personnel and HR concerns should go to Mike Andrews, Mike is his Supervisor."[48]

Mr. Pipito's notes of this June 16, 2018 meeting reflects a discussion about Mr. Appleton's harassment complaint.[49] Mr. Pipito now contends Dr. Rajput never said or suggested the restrictions pertaining to Messrs. Rodak and Appleton only applied in the workplace, never raised the Civility Policy, and never directed Mr. Pipito to direct personnel and human resource concerns to Mr. Andrews rather than Mr. Rodak.[50]

Mr. Pipito asked Dr. Rajput if the Authority similarly instructed Mr. Appleton and Mr. Rodak to refrain from contacting him at work and Dr. Rajput responded the Authority told both Mr. Appleton and Mr. Rodak not to contact Mr. Pipito at work unless there is an emergency, pertains to plan operational issues, or required by the Facility's Standard Operating Procedures.[51]

### *Dr. Rajput prepares the July 26, 2018 Memorandum.*

Consistent with Mr. Pipito's March 27, 2018 demand the Authority place all of its directions in writing, Dr. Rajput drafted a memorandum to document the complaints made by Mr. Rodak and Mr. Appleton regarding Mr. Pipito and to memorialize in writing the directives given to Mr. Pipito (the "July 2018 Memorandum").[52] Mr. Pipito does not deny Dr. Rajput drafted the

7

July 2018 Memorandum, but disputes the reasons Dr. Rajput drafted it.[53] The Authority's Board approved the July 2018 Memorandum pending review by the Authority's counsel.[54] The Authority's Solicitor, attorney James A. Downey, III, approved the July 2018 Memorandum and Mr. Pipito received it on July 26, 2018.[55]

The July 2018 Memorandum is addressed only to Mr. Pipito from Dr. Rajput with the subject line "Harassment."[56] Dr. Rajput wrote "[t]he purpose of this memo is to document the complaints brought against you from Walter Appleton, WWTP Swing Shift Operator and Leonard Rodak, Chief Mechanic/Process Chief of the Authority's Wastewater Treatment Facility. The complaints brought against you by the above two employees of the Authority include but are not limited to, creating a hostile work environment, harassment, intimidation, making disparaging/derogatory remarks, mocking and breach of the Civility Policy using foul language. It is the responsibility of the Authority to provide a safe, harassment free and non-hostile *work environment* to all its employees *at all the times within the Authority's premises*. In order to address the above complaints, we met with you on March 27, 2018 and June 16, 2018 and discussed the above complaints."[57]

Dr. Rajput continues, "[a]s a result of the meetings, you were directed to adhere to the following:

1. No contact whatsoever with Leonard Rodak except reporting problems pertaining to the plant operation.

2. No contact whatsoever with Walter Appleton except in an emergency situation and/or as specified in the [Facility's Standard Operating Procedures].

3. Refrain from making any gesture/mocking/disparaging or derogatory remarks/rumors to or about Walter Appleton, Leonard Rodak or any other employees.

4. You are not to engage in any discussions regarding Leonard Rodak and Walter Appleton with other employees.

8

5. Compliance with the Authority's Civility Policy.

6. Present any [Facility] Personnel/Human Resource concerns directly to Michael Andrews, P.E., [Facility] Manager."[58]

The July 2018 Memorandum required Mr. Pipito to "follow the above stated requirements" and advised "if you do not follow these requirements, disciplinary action may be taken up to and including termination of employment with the Authority."[59]

Mr. Pipito agrees it is the Authority's responsibility to provide a safe, harassment-free, non-hostile work environment for all employees at all times within the Authority's premises; agreed the Authority has no responsibility to govern employee behavior outside the workplace; conceded aside from the July 2018 Memorandum no one ever told him he may be subject to discipline for any communications made outside the workplace; the July 2018 Memorandum does not mention anything about union activities he engaged in; believes the July 2018 Memorandum "is solely about the harassment charges that were alleged"; he understood the directive to have no contact with Mr. Rodak except for reporting problems at the Facility applied to work; he understood the directives regarding no contact with Mr. Rodak and Mr. Appleton; and agreed conduct described in the third paragraph regarding gestures and remarks is prohibited by the Civility Policy.[60] As to the directive in paragraph 3, Mr. Pipito testified he understood it to apply to his conduct in the workplace because "it's not professional. It shouldn't be in the workplace," but then testified he believed "the whole memo is just period. It's a blanket. It's not just in the workplace. It doesn't say that it's only in the workplace. It doesn't say it's only outside the workplace" and "[i]t doesn't say whether or not it's strictly to work or outside of work. It just says you're not allowed to."[61]

9

### *Mr. Pipito's September 6, 2018 grievance meeting.*

Mr. Pipito filed a grievance with the Union seeking to remove the July 2018 Memorandum from his personnel file.[62] The Authority held a meeting on September 6, 2018 attended by Mr. Pipito and Union representative Paul Betzler and Union Steward Ron Smith, Solicitor Downey, Dr. Rajput, Mr. Andrews, and Colleen Dunn, Finance Manager for the Authority.[63] Both Mr. Pipito and Ms. Dunn took notes of the September 6, 2018 meeting.[64]

Mr. Pipito's notes reflect, and his testimony confirms, Mr. Betzler's argument for removing the July 2018 Memorandum from Mr. Pipito's personnel file and Mr. Pipito's challenge to the factual basis of Mr. Rodak's and Mr. Appleton's harassment complaints.[65] Mr. Pipito testified he wanted the July 2018 Memorandum removed from his personnel file because he feared he could be subject to progressive discipline if the July 2018 Memorandum remained.[66]

Mr. Pipito swore knowing his grievance did not include concerns the July 2018 Memorandum violated his constitutional rights.[67] Mr. Pipito admits neither he nor Mr. Betzler raised constitutional concerns about the July 2018 Memorandum but contends neither he nor Mr. Betzler are "First Amendment lawyers."[68]

### *Mr. Pipito's September 12, 2018 admission the July 2018 Memorandum is an employee disciplinary measure.*

When the Authority did not remove the July 2018 Memorandum from his file, Mr. Pipito filed a complaint with the Pennsylvania Labor Relations Board on September 12, 2018 challenging the July 2018 Memorandum as disciplinary in nature as the Authority's "crusade to fire [him]" in retaliation for protected conduct he took in a 2014 Public Employees Relations Act complaint he filed against the Authority.[69] In his September 12, 2018 complaint to the Pennsylvania Labor Relations Board, Mr. Pipito charged: "But the actions I complain about here are several in

10

particular. I have been threatened with discharge if I speak about certain matters *with my union chairman or certain co-workers*. I received this edict on July 26, 2018 via memorandum. In that same memorandum I am being accused of violating [the Authority's] 'Civility Policy.' The allegations against me are contrived, and reflect [the Authority's] crusade to fire me. And then, on August 3, 2018 I was given a formal discipline (dated July 31st), again replete with phony allegations. I am being subjected to harassment and formal discipline because of my Public Employee Relations Act-protected activities, and I ask that the Board order [the Authority] to take all remedial steps to rectify this unfair labor practice."[70]

He did not mention a restraint on speech outside of the workplace. He admitted the July 2018 Memorandum addressed discipline in the workplace.

### *Mr. Pipito sues the Authority and Dr. Rajput in November 2018.*

Mr. Pipito changed his view a little over two months later when he sued the Authority and Dr. Rajput in his individual capacity alleging the July 2018 Memorandum violates his First Amendment rights to protected speech on matters of public concern.[71] He claims the July 2018 Memorandum restricts protected speech by prohibiting him from "discussing concerns about the Authority with anyone but a particular manager" and "speaking critically about certain personnel, irrespective of the circumstances."[72] Mr. Pipito alleges the July 2018 Memorandum's proscriptions are "overbroad and infring[e] on [his] right as a citizen to speak out on matters of public concern."[73] Mr. Pipito alleges Dr. Rajput, in his individual capacity, acted with malice and reckless indifference to Mr. Pipito's First Amendment right to free speech causing him "colossal harm."[74]

11

*Additional harassment complaints filed by Mr. Rodak and Mr. Appleton and subsequent meetings with Mr. Pipito.*

On April 2 and 5, 2019, Mr. Rodak and Mr. Appleton submitted additional written complaints to Dr. Rajput regarding Mr. Pipito's conduct. Both Mr. Rodak and Mr. Appleton complained of continued harassment by Mr. Pipito and perceived violations of the July 2018 Memorandum.[75] Mr. Pipito does not dispute Mr. Rodak and Mr. Appleton made the allegations but disputes the bases of the allegations.[76]

On April 18, 2019, Mr. Pipito and Union Steward Mr. Smith met with Dr. Rajput, Mr. Andrews, Ms. Dunn, and Mr. Smythe.[77] The Authority provided Mr. Pipito with copies of the new complaints submitted by Mr. Rodak and Mr. Appleton; advised Mr. Pipito the Authority would not take disciplinary action at this time due to Mr. Pipito's lawsuit and the Authority's Solicitor Downey will further investigate the complaints.[78] There is no dispute the Authority did not discipline Mr. Pipito as a result of Mr. Rodak's and Mr. Appleton's complaints.[79]

*Mr. Rodak's protected activity after the July 2018 Memorandum.*

Although the timing is unclear, Mr. Pipito contacted, or attempted to contact, the Bucks County Courier Times, a local newspaper, after the July 2018 Memorandum to report "a lot of political affiliation between employees and board of directors and judges and sheriffs and constables."[80] Mr. Pipito testified "It's like I'm bottled up" and "don't know where to go," so he called a reporter at the local newspaper. The Authority received a Right-to-Know request from the newspaper.[81] Mr. Pipito does not dispute the Authority received a Right-to-Know request from the Bucks County Courier Times, but disputes there is "evidence it had anything to do with [his] unsuccessful effort to reach someone there."[82] Mr. Pipito now contends he "unsuccessfully tried to reach someone at the Bucks County Courier Times."[83]

12

On June 13, 2019, Mr. Pipito published a copy of our February 21, 2019 Order denying the Authority's Motion to dismiss in a common area of the Facility for all employees to see with a notation "[a] Federal Judge has ruled we have the right to speak on matters of Public Concern!"[84] Mr. Pipito adduces no evidence the Authority affected Mr. Pipito's employment for this post-July 2018 Memorandum conduct. He continues to work at the Facility with no change in his employment.

## II.   Analysis[85]

The parties cross-move for summary judgment. The Authority and Dr. Rajput argue Mr. Pipito lacks standing to raise the First Amendment claim and, even if he has standing, the July 2018 Memorandum does not prohibit speech involving a "matter of public concern" and the Authority had adequate justification in doing so in the interest of maintaining a safe, harassment-free workplace. It also argues claims against Dr. Rajput are barred by qualified immunity, the *Monell*[86] claim against the Authority is not supported by evidence, and the punitive damages claim fails as a matter of law.[87]

Mr. Pipito seeks summary judgment arguing the July 2018 Memorandum is a "prior restraint" of speech on matters of public concern and the Authority's interests do not "supersede" his rights and the public interest.[88] In response to the Authority's motion, Mr. Pipito again argues the July 2018 Memorandum restricts his speech on matters of public concern and the Authority has no adequate justification for its July 2018 Memorandum.[89] Mr. Pipito further argues Dr. Rajput failed to carry his burden on qualified immunity because it is clearly established "that a public employee's employment cannot be conditioned on his not speaking as a private citizen upon matters of public concern" and seeking advice of Solicitor Downey on the July 2018 Memorandum's constitutional fitness "does not cloak" Dr. Rajput with immunity. He further

13

responds even if Dr. Rajput is entitled to qualified immunity, claims against the Authority may still proceed under a *Monell* theory of liability and the question of punitive damages must be determined by a jury.

### A. Mr. Pipito does not adduce evidence of a First Amendment claim.

Although the July 2018 Memorandum does not state its directives apply to Mr. Pipito's speech outside the workplace, Mr. Pipito's case is based entirely on his belated lawyer-assisted reading the July 2018 Memorandum as extending to "extra-occupational speech" because the July 2018 Memorandum fails to specify its directives apply *only* in the workplace.[90]

Mr. Pipito alleges the July 2018 Memorandum is an impermissible prior restraint on his speech,[91] is "overbroad" and its "overinclusiveness [sic] encroaches on [his] ability to speak on matters of public concern"[92] Mr. Pipito argues while the July 2018 Memorandum appears to justify its restrictions in the context of providing a safe, harassment-free workplace to its employees, the July 2018 Memorandum does not "circumscribe its restrictions to the Authority's premises or while [he] is working."[93] Mr. Pipito argues the July 2018 Memorandum is not limited in scope to time, place or manner and, by its plain language, "undoubtedly restricts [his] speech on matters of public concern."[94]

He contends the July 2018 Memorandum would, *inter alia*, prohibit him from speaking with Mr. Rodak at church on matters of religion or with Mr. Appleton at a township meeting on matters of zoning policy; prohibit him from sending either Mr. Rodak or Mr. Appleton letters or pamphlets if Mr. Pipito chose to run for public office; and prohibit him from reporting environmental violations committed by Mr. Rodak to the Pennsylvania Department of Environmental Protection or from filing a complaint with the Equal Employment Opportunity Commission against the Authority for racial discrimination in hiring.[95]

14

Mr. Pipito cites his own deposition testimony describing the restraining effect of the July 2018 Memorandum on matters of public concern where he testified he would be concerned or discouraged from knocking on Mr. Rodak's door if Mr. Pipito ran for public office;[96] if a protest occurred in Doylestown on a matter of public concern, he would be concerned about making any contact with Mr. Rodak and would be concerned about contact with Mr. Rodak if he went to a public meeting of the Authority's Board;[97] he would be similarly concerned to send campaign literature to Mr. Appleton and attend a public protest or an Authority Board meeting for fear of contact with Mr. Appleton;[98] he would be concerned to report any irregularity, for example of Mr. Rodak "stealing time," to the Authority;[99] he would be concerned about reporting discrimination to the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission;[100] and he would be concerned about reporting Dr. Rajput's possible conflict of interest to the Bucks County District Attorney or the state Ethics Commission.[101]

The Authority argues the July 2018 Memorandum does not restrict protected speech and the record shows the July 2018 Memorandum does not, and did not, chill Mr. Pipito's speech because he engaged in protected conduct after the Authority issued the July 2018 Memorandum.[102] It argues even if the July 2018 Memorandum restricts Mr. Pipito's speech as a citizen on matters of public concern, there is adequate justification in issuing the July 2018 Memorandum.

### 1. The July 2018 Memorandum does not restrict or chill Mr. Pipito's speech as a citizen on a matter of public concern.

The Supreme Court allows government employers to "impose restraints on the job-related speech of public employees that would plainly be unconstitutional if applied to the public at large."[103] But these restraints are not applicable where an employee speaks as a citizen on a matter of public concern.[104]

15

"Prior restraint of speech seeks to prevent speech from being expressed to begin with"[105] and "chills potential speech before it happens."[106] As a public employee, Mr. Pipito's speech is protected by the First Amendment only "(1) if he spoke 'as a citizen (and not as an employee),' (2) if his speech involved 'a matter of public concern,' and (3) if his employer lacked an 'adequate justification' for treating him differently from the general public, based on a balancing of his and his employer's interests under *Pickering* ...."[107]

We apply the framework developed by the Supreme Court's decision in *Pickering* to our analysis of restrictions on speech.[108] We first ask whether the restrictions in the July 2018 Memorandum impact Mr. Pipito's speech (1) as a citizen (not an employee) and (2) on a matter of public concern.[109] If the answer to either question is no, Mr. Pipito has no First Amendment claim.[110] "If the answer to both questions is yes, then the possibility of a First Amendment claim arises ... [and] [t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other members of the public."[111]

The key question is whether the July 2018 Memorandum restricts Mr. Pipito's speech as a citizen on a matter of public concern. Before we apply the *Pickering* analysis, we must understand the context in which *Pickering* arose as explained by the Supreme Court in *Connick v. Myers*. In *Connick*, a district attorney fired an assistant district attorney for passing out a questionnaire to co-workers regarding an office transfer policy. The assistant district attorney objected to a transfer within the department and prepared the questionnaire to solicit the views of her co-workers on the transfer policy, the need for a grievance committee, and whether employees felt pressured to work in political campaigns.[112] After learning of the questionnaire, the district attorney terminated the assistant district attorney for refusing to accept a transfer and for insubordination in distributing the questionnaire.

16

The assistant district attorney filed a civil rights action alleging wrongful termination for exercising her right to free speech.[113] The district court found the termination occurred because of the questionnaire which involved matters of public concern and the state did not "'clearly demonstrate[e] that the survey 'substantially interfered' with the operations of the District Attorney's office."[114] The court of appeals affirmed.

The Supreme Court reversed. It began by finding the district court, and the court of appeals, misapplied *Pickering* and "got off on the wrong foot in this case by initially finding that, '[t]aken as a whole, the issues presented in the questionnaire relate to the effective functioning of the District Attorney's Office and are matters of public importance and concern.'"[115] The Supreme Court, providing the context of *Pickering*, instructed: "[t]he repeated emphasis in *Pickering* on the right of a public employee 'as a citizen, in commenting upon matters of public concern' was not accidental. This language, reiterated in all of *Pickering's* progeny, reflects both the historical evolvement of the rights of public employees, and the common sense realization that government offices could not function if every employment decision became a constitutional matter."[116] The Court in *Connick* explained "the precedents in which *Pickering* is rooted, the invalidated statutes and actions sought to suppress the rights of public employees to participate in public affairs" and identified the issue as "whether government employees could be prevented or 'chilled' by the fear of discharge from joining political parties and other associations that certain public officials might find 'subversive.'"[117]

We are instructed by the Court in *Connick* not all employee expression is speech on a matter of public concern: "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the

17

name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable."[118]  The Court held "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.[119]

Under *Connick*, we must "ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the state."[120]  We determine whether an employee's speech addresses a matter of public concern "by the content, form and context of a given statement, as revealed by the whole record" and "[t]he inquiry into the protected status of speech is one of law, not fact."[121]

Considering the "content, form and context" of the July 2018 Memorandum "as revealed by the whole record"—the standard as directed in *Connick*—the July 2018 Memorandum does not restrict Mr. Pipito's speech as a citizen on matters of public concern.  First, and most importantly, is the context of the July 2018 Memorandum.  The Authority issued the July 2018 Memorandum in response to Mr. Rodak's and Mr. Appleton's harassment complaints.  Mr. Pipito does not dispute Messrs. Rodak and Appleton filed harassment complaints; he disputes the facts asserted by both men in their complaints.  But the undisputed fact remains the Authority issued the July 2018 Memorandum *after* receiving harassment complaints.  And there is no dispute Mr. Pipito's conduct *before* the July 2018 Memorandum—some of which he admits to—is not protected speech.  For

example, the November 2-3, 2017 incident prompting Mr. Rodak's initial harassment complaint is largely undisputed by Mr. Pipito. He admits his exchange with Mr. Rodak contained foul language, with Mr. Rodak telling Mr. Pipito to "stay the f*** out of [Mr. Rodak's] business" and Mr. Pipito responding, "go suck a d***."[122]

The content, or language, of the July 2018 Memorandum arises in the context of employee discipline. The July 2018 Memorandum addresses the harassment complaints, advising Mr. Pipito "two employees" allege he "creat[ed] a hostile work environment" and "breach[ed] ... the Civility Policy [by] using foul language."[123] The Authority advised Mr. Pipito it has the responsibility "to provide a safe, harassment free and non-hostile *work environment* to all employees at all the times *within the Authority's premises*," a responsibility Mr. Pipito agrees the Authority has and owes to him. The July 2018 Memorandum defines its scope: work environment and within the Authority's premises. Contrary to Mr. Pipito's theories, the Authority does not own a church or the public square in Doylestown.

And Mr. Pipito knew this. The post-discovery record[124] now shows Mr. Pipito considered the July 2018 Memorandum an employment disciplinary measure; the September 6, 2018 Union grievance meeting sought the removal of the July 2018 Memorandum from his personnel file because Mr. Pipito feared it could be the basis for progressive discipline. Mr. Pipito, accompanied by Union representation, did not express any concern the July 2018 Memorandum is a violation of his First Amendment rights.

When the Authority did not remove the July 2018 Memorandum from his file, Mr. Pipito filed a complaint with the Pennsylvania Labor Relations Board on September 12, 2018 challenging the July 2018 Memorandum as disciplinary in nature as the Authority's "crusade to fire [him]" in retaliation for protected conduct he took in 2014. In his complaint to the Pennsylvania Labor

19

Relations Board, Mr. Pipito charged: "But the actions I complain about here are several in particular. I have been threatened with discharge if I speak about certain matters *with my union chairman or certain co-workers*. I received this edict on July 26, 2018 via memorandum. In that same memorandum I am being accused of violating [the Authority's] 'Civility Policy.' The allegations against me are contrived, and reflect [the Authority's] crusade to fire me. And then, on August 3, 2018 I was given a formal discipline (dated July 31st), again replete with phony allegations. I am being subjected to harassment and formal discipline because of my Public Employee Relations Act-protected activities, and I ask that the Board order [the Authority] to take all remedial steps to rectify this unfair labor practice."[125] Mr. Pipito additionally at least "tried" to contact a local newspaper and posted our February 21, 2019 Order in the Facility for his co-workers to see.

The Supreme Court instructs us "[u]nderlying [its] cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'"[126] The July 2018 Memorandum does not impermissibly restrict Mr. Pipito's speech as a public citizen on matters of public concern. We will not "constitutionalize" his grievance with the Authority's July 2018 Memorandum issued in response to harassment charges in its workplace.

> ### 2. Even if the July 2018 Memorandum impacted Mr. Pipito's speech as a citizen on matter of public concern, the Authority had adequate justification for issuing it.

Consideration of adequate justification "reflects the importance of the relationship between the speaker's expressions and employment."[127] "A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." We are directed by *Pickering*

20

to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees."[128]

In balancing the interests, the Court in *Pickering* highlighted a government employer "has interests ... in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."[129] If the Authority's interest is "significantly greater" than Mr. Pipito's interest in public speech on matters of public concern, then his speech is not protected.[130]

Our Court of Appeals analogizes the *Pickering* balancing test to a "sliding scale."[131] On Mr. Pipito's side of the scale, we must consider his interest and the public in the speech at issue. On the Authority's side, we must address the Authority's "legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'"[132] The balancing is "a fact-intensive inquiry that requires consideration of the entire record, and must yield different results depending on the relative strengths of the issue of public concern and the employer's interest."[133] The sliding scale considers "the amount of disruption a public employer has to tolerate [in proportion] to the importance of the disputed speech to the public."[134]

The Authority asserts Mr. Pipito's conduct about Mr. Rodak and Mr. Appleton more than adequately justifies the July 2018 Memorandum. There is no dispute Mr. Rodak and Mr. Appleton filed harassment complaints with the Authority regarding Mr. Pipito's conduct. Mr. Pipito does not dispute he had a confrontation with Mr. Rodak around November 3, 2017 in which he used obscene language.[135] Mr. Pipito does not dispute Mr. Appleton's harassment complaint and admitted "the context" of Mr. Appleton's complaint "may be a little accurate."[136]

21

The Authority asserts it had the responsibility to respond to Messrs. Rodak's and Appleton's harassment complaints, including complaints of anxiety and stress caused by their interactions with Mr. Pipito. The Authority points to continued complaints by Messrs. Rodak and Appleton regarding Mr. Pipito's continuing conduct and the stress causing them, and Mr. Rodak's recently filed Union grievance contending the Authority allowed Mr. Pipito to continue to harass him despite earlier harassment complaints.[137] The Authority argues Mr. Pipito's use of foul language with Mr. Rodak and Mr. Appleton and his "spreading of rumors about his co-workers at work" prompting the July 2018 Memorandum is not protected speech. It further argues the July 2018 Memorandum has never been enforced to bar Mr. Pipito from engaging in any protected speech, he is in no "realistic danger"[138] of the Authority applying the July 2018 Memorandum to restrict protected speech, and Mr. Pipito engaged in protected conduct after the July 2018 Memorandum with no consequence.

Mr. Pipito responds the Authority offers no compelling justification for restricting his speech in matters of public concern. Mr. Pipito concedes the Authority provides justification for speech restrictions inside the workplace but argues it does not offer any justification for restricting speech outside the workplace. He argues simply because the Authority has not taken any action against him since the July 2018 Memorandum does not mean it could not take some action now or in the future. Mr. Pipito swears after circulating copies of the Court's February 21, 2019 Order in work, the Authority "subjected him to interrogation" which he interpreted as a "disciplinary interrogation ... as an effort to enforce the disciplinary memorandum and chill my right to free speech."[139] We disagree this is evidence of any discipline in retaliation for speech on matters of public concern because, as Mr. Pipito admits, his conduct in circulating copies of the Court's Order

occurred within the Facility and admittedly is not public speech on a matter of public concern, and Mr. Pipito expressly abandoned any retaliation claim.

Applying the *Pickering* balancing test, on one side we consider Mr. Pipito's interests and the public's interest in the speech he contends is prohibited. On the other side of the scale, we consider the Authority's interest in providing a safe, harassment-free workplace in response to complaints by Mr. Pipito's co-workers.

We may consider the type of speech Mr. Pipito believes is prohibited—for example, whistleblowing by reporting Mr. Rodak to the Pennsylvania Department of Environmental Protection or reporting the Authority for discriminatory hiring practices to the Equal Employment Opportunity Commission—of significant interest to the public. But there is no evidence the July 2018 Memorandum does so. We cannot ignore the Authority has a Whistleblower Policy "encourag[ing] all employees including Supervisors, acting in good faith, to report suspected or actual wrongful conduct. ..." defined as "[a] serious violation of Authority policy; a violation of applicable state and federal laws; ..."[140] There is no dispute Mr. Pipito read the Whistleblower Policy before the July 2018 Memorandum and, at the time of its issuance, understood its provisions.[141] We cannot ignore the Authority's Civility Policy which Mr. Pipito concedes he received, read, and understood,[142] providing, *inter alia*, "[t]he Authority does not intend this Policy to deprive any employee of his or her right to appropriate self-expression. Rather, it seeks to maintain an environment in which people can feel safe, secure and continue to grow in their occupation."[143] Mr. Pipito admits after the interchange with Mr. Rodak in November 2017 (prompting Mr. Rodak's harassment complaint), Mr. Pipito "filled a harassment or civility against" Mr. Rodak for using foul language.[144]

23

Based on the record before us on summary judgment, the Authority's interests in creating a safe, hostile-free workplace outweigh the interests of Mr. Pipito's speech where, as here, there is no evidence the July 2018 Memorandum would prohibit him from speaking on matters of public concern.

### 3. The July 2018 Memorandum is not void as facially overbroad.

Although not entirely clear because the parties did not fully brief the issue, Mr. Pipito alleges the July 2018 Memorandum is overbroad. Mr. Pipito alleges the July 2018 Memorandum violates the First Amendment because it is overbroad in two instances; he is proscribed "from discussing concerns about the Authority with anyone but a particular manager" and "from speaking critically about certain personnel, irrespective of the circumstances."[145] Although Mr. Pipito alleges these are "but examples," he provides no other argument in his summary judgment briefing aside from arguing the July 2018 Memorandum "due to its overinclusiveness [sic], encroaches on [his] ability to speak on matters of public concern."[146]

The Supreme Court recognizes a First Amendment overbreadth doctrine challenging the facial validity of a statute.[147] The overbreadth doctrine "seeks to strike a balance between competing social costs ... [o]n the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its applications is perfectly constitutional— particularly a law directed at conduct so antisocial that it has been made criminal—has obvious harmful effects. In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."[148]

24

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."[149] "The next step is to determine 'whether the statute, as we have construed it, [pen]alizes a substantial amount of protected expressive activity.'"[150] We are directed by our Court of Appeals to determine whether there is any "reasonable limiting construction ... that would render the policy constitutional" before striking it as overbroad because the "doctrine is not casually employed."[151]

To the extent Mr. Pipito seeks summary judgment on the overbreadth doctrine, we deny it because he failed to brief the issue.[152] Failing to do so, he has not met his burden of being entitled to judgment as a matter of law.

### B. There is no evidence of injury-in-fact to satisfy constitutional standing.

The Authority argues Mr. Pipito fails to show injury-in-fact sufficient to meet constitutional standing requirements. Mr. Pipito chose to not address the Authority's standing argument in response to its motion for summary judgment.[153]

To meet the "constitutional minimum of standing," Mr. Pipito must first "have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, ...; and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.'"[154] "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court."[155] And third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"[156]

In the context of First Amendment litigation, "governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights."[157] One making a constitutional challenge "must show he has sustained, or is

immediately in danger of sustaining, a direct injury as the result of that action."[158]   While one

"does not have to await the consummation of threatened injury to obtain preventive relief" and it

is enough "if the injury is certainly impending," there must be a "realistic danger of sustaining a

direct injury as a result of" the challenged statute or proscription.[159]

In the "unique standing considerations" of First Amendment challenges, the Supreme

Court, "[i]n an effort to avoid the chilling effect of sweeping restrictions ... endorsed what might

be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak

first and take their chances with the consequences."[160]  In a pre-enforcement challenge, a plaintiff

may satisfy the injury-in-fact requirement where he alleges "an intention to engage in a course of

conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists

a credible threat of prosecution thereunder."[161]

### 1. Mr. Pipito fails to adduce evidence of a realistic danger or credible threat of sustaining injury as a result of the July 2018 Memorandum.

Mr. Pipito contends the July 2018 Memorandum at paragraph 1 "would ... prohibit [him]

from speaking to [Mr.] Rodak at church on matters of religion" and, at paragraph 2, "with [Mr.]

Appleton at a township meeting on matters of zoning policy" and both proscriptions would bar

Mr. Pipito "from sending [Mr. Rodak and Mr. Appleton] letters or pamphlets if he chose to run

for public office."[162]  As for paragraph 3, Mr. Pipito contends it would prohibit him from "reporting

environmental violations committed by [Mr.] Rodak to the state Department of Environmental

Protection" and, in paragraph 6, prohibit him "from filing a complaint with the U.S. Equal

Employment Opportunity Commission against the Authority for racial discrimination in hiring."[163]

Mr. Pipito cites his deposition testimony describing the restraining effect of the July 2018

Memorandum on matters of public concern where he testified he would be concerned or

26

discouraged from knocking on Mr. Rodak's door if Mr. Pipito ran for public office;[164] if a protest occurred in Doylestown on a matter of public concern, he would be concerned about making any contact with Mr. Rodak and would be concerned about contact with Mr. Rodak if he went to a public meeting of the Authority's Board;[165] he would be similarly concerned to send campaign literature to Mr. Appleton and attend a public protest or an Authority Board meeting for fear of contact with Mr. Appleton;[166] he would be concerned to report any irregularity, for example of Mr. Rodak "stealing time," to the Authority;[167] he would be concerned about reporting discrimination to the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission;[168] and he would be concerned about reporting Dr. Rajput's possible conflict of interest to the Bucks County District Attorney or the state Ethics Commission.[169]

Mr. Pipito argues these are just examples of the "myriad ways" the July 2018 Memorandum, because of its "overinclusiveness, encroaches on [his] ability to speak on matters of public concern."[170] Mr. Pipito offers no citation to the record showing he attempted to speak to either Mr. Rodak or Mr. Appleton outside of work. He does not adduce evidence or an explanation how the directive to "refrain from making any gesture/mocking/disparaging or derogatory remarks/rumors to or about" Mr. Rodak, Mr. Appleton, or any other employee would bar a report to the Department of Environmental Protection regarding environmental violations or how a requirement he report personnel or human resource concerns directly to Mr. Andrews, the Facility's Manager, would prohibit Mr. Pipito from filing a complaint with the EEOC for racial discrimination in hiring, or any other conduct.

In response, the Authority argues Mr. Pipito does not contend the July 2018 Memorandum actually silenced any protected speech, only that it *could* chill his speech, and has not shown a "realistic danger of sustaining a direct injury …."[171] Instead, the Authority argues, Mr. Pipito

27

offers no record evidence "to support his interpretation of the directives in the Memorandum" and simply argues since the July 2018 Memorandum does not explicitly state the directives apply only to speech in the workplace we must assume the directives apply to outside the workplace.[172] Mr. Pipito concedes if the July 2018 Memorandum "applied only to [his] speech on the job, then he would have no First Amendment claim ...."[173]

The Authority contends when considering the record, Mr. Pipito's interpretation of the July 2018 Memorandum is unreasonable and not supported by any objective reading of it and the surrounding circumstances. It first argues the July 2018 Memorandum only regulates Mr. Pipito's speech in communicating to his co-workers at work and carrying out his official job duties at the Authority. It cites the language of the July 2018 Memorandum itself stating its purpose is to address Mr. Rodak's and Mr. Appleton's complaints of harassment by Mr. Pipito in the workplace including his use of disparaging and derogatory remarks, foul language, and gossip at work; the subject line of the July 2018 Memorandum reads "Harassment" and identifies its purpose as "to document the complaints brought against you from Walter Appleton .. and Leonard Rodak ..." and the Authority's responsibility "to provide a safe, harassment free and non-hostile *work environment* to all employees at the time times *within the Authority's premises*."[174]  The Authority cites Mr. Pipito's deposition testimony agreeing the Authority has responsibility to provide a safe, harassment free and non-hostile work environment for all employees on its premises and agreeing the Authority has no responsibility to govern his behavior outside the workplace.[175]

The Authority argues nothing in the July 2018 Memorandum bars Mr. Pipito from engaging in protected speech outside the workplace. For example, paragraphs 1 and 2 "identify permissible communications" Mr. Pipito "could engage in" with Messrs. Rodak and Appleton

28

"while doing his job" and do not, on their face, say the directives extend outside or work or apply to Mr. Pipito as a private citizen.[176] Mr. Pipito testified he understood paragraph 3, prohibiting Mr. Pipito from "making any gesture/mocking/ disparaging or derogatory remarks/rumors to or about [Messrs.] Appleton, Rodak or any other employees," to pertain to the harassment complaints made by Messrs. Rodak and Appleton and the proscribed conduct is the same as prohibited by the Authority's Civility Policy, a policy he concedes does not violate his constitutional rights.[177]

The Authority argues paragraph 4—prohibiting Mr. Pipito from "engag[ing] in any discussions regarding [Mr.] Rodak and [Mr.] Appleton with other employees,"—"should have been clear was aimed at [Mr. Pipito's] conduct complained of by" Messrs. Rodak and Appleton and are contained in the Authority's Civility Policy. Mr. Pipito testified he does not contest paragraph 5 of the July 2018 Memorandum, requiring him to comply with the Authority's Civility Policy, and admitted the Civility Policy "does not violate my constitutional rights."[178] The Civility Policy, which Mr. Pipito concedes he received, read, and understood,[179] provides, *inter alia*, "[t]he Authority does not intend this Policy to deprive any employee of his or her right to appropriate self-expression. Rather, it seeks to maintain an environment in which people can feel safe, secure and continue to grow in their occupation."[180] In fact, Mr. Pipito testified after the interchange with Mr. Rodak in November 2017 (prompting Mr. Rodak's harassment complaint), Mr. Pipito "filled a harassment or civility against" Mr. Rodak for using foul language.[181]

The Authority argues Mr. Pipito's subjective belief the July 2018 Memorandum prohibits him from engaging in protected speech does not constitute a "realistic danger" of a constitutional violation. For example, Mr. Pipito testified the July 2018 Memorandum prohibits him from reporting corruption at the Facility.[182] But Mr. Pipito testified he received, read, and understood the Authority's Whistleblower Policy protecting employees who report "alleged wrongful conduct

29

to a designated Authority official or public body."[183]  Mr. Pipito conceded no one at the Authority told him the July 2018 Memorandum modified or superseded the Whistleblower Policy.[184]

Mr. Pipito testified he did not have concerns about paragraph 6 because reporting "personnel/human relations concerns" directly to his supervisor Mr. Andrews is "the management tree you follow."[185]  He testified no one from the Authority ever told him at the two meetings he had regarding harassment complaints before Dr. Rajput issued the July 2018 Memorandum, or at any time, the July 2018 Memorandum restricted conduct outside the workplace.[186]  His counsel then improperly interposed a speaking objection.[187]

The coached Mr. Pipito then clarified his testimony identifying protected speech prohibited by the July 2018 Memorandum as "I can't go to counsel. I can't go to the DEP. I can't go to the DA's office. I can't approach any political person, any agency. I'm not allowed to contact anyone" and, specifically, he cannot "go to the DA's office" regarding the "corruption in and out of my facility" and the July 2018 Memorandum prohibits him from contact "on the golf course, … the sewer plant, … the Burger King" and is "not allowed to discuss with the manager at McDonald's … I'm having a bad day and say, this guy over here."[188]

Despite his testimony, Mr. Pipito engaged in protected speech both inside and outside of work without an adverse response. Mr. Pipito admittedly filed a complaint with the Pennsylvania Labor Relations Board in September 2018 about the July 2018 Memorandum.[189]  On June 13, 2019, Mr. Pipito published a copy of our February 21, 2019 Order denying the Authority's Motion to dismiss in a common area of the Facility for all employees to see with a notation "[a] Federal Judge has ruled we have the right to speak on matters of Public Concern!"[190] And at some point in 2019, Mr. Pipito either contacted, or "tried" to contact a local newspaper. There is no evidence the Authority took action against Mr. Pipito for his post-July 2018 Memorandum protected conduct.

Applying the summary judgment standard to the cross-motions for summary judgment, we find no genuine issue of material fact on the issue of injury-in-fact. Although Mr. Pipito need not "await the consummation of a threatened injury to obtain preventive relief," we have no record evidence of a "realistic" or "immediate" danger or credible threat of any disciplinary action, including termination, taken by the Authority against him. At best, we have Mr. Pipito's belief if he wanted to speak on matters of public concern, he would suffer discipline at work. There is nothing in the record to support this contention and, in fact, the record shows the Authority did not discipline him when he exercised protected conduct post-July 2018 Memorandum.

### C. Dr. Rajput is entitled to qualified immunity and the *Monell* claim against the Authority fails.

Even assuming Mr. Pipito satisfied constitutional standing and assuming the July 2018 Memorandum chilled Mr. Pipito's speech as a citizen on matters of public concern and the Authority did not have adequate justification for issuing it, we enter summary judgment in the Authority's favor on his claims against Dr. Rajput and the Authority. Dr. Rajput is entitled to qualified immunity and there is no evidence of an unconstitutional custom or policy to establish liability against the Authority under a *Monell* theory.[191]

#### 1. Dr. Rajput is entitled to qualified immunity.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[192] A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[193]

Although the Supreme Court's decisions on qualified immunity "[do] not require a case directly on point for a right to be clearly established, existing precedent must have placed the

statutory or constitutional question beyond debate."[194] The clearly established right must be defined with specificity and the Supreme Court's recent decisions "repeatedly" instruct "courts ... not to define clearly established law at a high level of generality."[195] We are directed by the Court "immunity protects all but the plainly incompetent or those who knowingly violate the law."[196] The qualified immunity analysis is "guided by two questions: (1) did the government actor violate a constitutional right? and (2) was that right 'clearly established' at the time of the challenged conduct?"[197]

Dr. Rajput argues the July 2018 Memorandum did not violate a clearly established right he reasonably should have known at the time: Mr. Pipito's foul language, derogatory remarks, and rumor-spreading in the workplace, as complained of by Mr. Rodak and Mr. Appleton, and is not protected speech and within the Authority's power to regulate; there are no decisions from the Supreme Court or our Court of Appeals addressing the same or analogous circumstances; Mr. Pipito does not allege retaliation; the Authority issued the July 2018 Memorandum only to Mr. Pipito to address workplace harassment and approved by legal counsel; and Mr. Pipito does not allege the July 2018 Memorandum has barred him from engaging in protected speech, but only it could be interpreted as overbroad and implicate protected speech.[198]

Mr. Pipito responds Dr. Rajput fails to meet his burden to show he is entitled to qualified immunity.[199] Mr. Pipito argues we cannot, on summary judgment accept the Authority's "benign reading" of the July 2018 Memorandum and we must draw all reasonable inferences in his favor. Mr. Pipito argues his rights are clearly established under case law from our Court of Appeals.[200]

The case law cited by Mr. Pipito to support his "clearly established" argument is distinguishable. In *Dougherty*, the Philadelphia School District fired one if its administrators after he contacted a newspaper to report the Superintendent's alleged wrongdoing in awarding a

32

contract.[201] Our Court of Appeals found the District's termination of the administrator for whistleblowing a violation of clearly established rights because "it has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."[202] *Dougherty* is distinguishable.[203] Unlike the plaintiff in *Dougherty*, Mr. Pipito does not claim First Amendment retaliation; the Authority has not terminated him or disciplined him; and we already found it does not restrict his speech on matters of public importance and, even if it did, the *Pickering* balancing test favors the Authority.

Mr. Pipito cites no cases where a disciplinary memorandum issued by a governmental employer to address allegations of harassment in the workplace violates a clearly established right. There is no basis to find Dr. Rajput reasonably should have known that the July 2018 Memorandum, designed to address Mr. Rodak's and Mr. Appleton's complaints of harassment against Mr. Pipito, imposed unconstitutional limitations on Mr. Pipito's protected speech. If we were to accept Mr. Pipito's argument, every disciplinary memorandum issued by a government employee in response to a personnel issue would run afoul of the First Amendment.[204]

### 2. The *Monell* claim against the Authority fails.

The Authority next argues Mr. Pipito's claim against it fails because Dr. Rajput is entitled to qualified immunity and there is no evidence to support a *Monell* claim. Mr. Pipito responds even if Dr. Rajput is entitled to qualified immunity it does not mean his claim against the Authority fails. This is correct but misses the issue. The Authority "may not be held liable for constitutional torts under § 1983 on a vicarious liability theory rooted in *respondeat superior* ...."[205] As a matter of law, then, the Authority cannot be held liable for Dr. Rajput's actions.

The only liability theory against the Authority available to Mr. Pipito is under *Monell*. Under the Supreme Court's decision in *Monell*, the Authority can only be liable under section 1983

33

"when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom."[206] There are two ways to maintain a section 1983 claim against a municipality: "[a] plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries ... or that they were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice,' ...."[207] A "[p]olicy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict."[208] A "[c]ustom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law."[209]

We already found the July 2018 Memorandum does not offend the First Amendment and, with no unconstitutional policy or custom, Mr. Pipito's *Monell* claim fails.

## III. Conclusion

We grant the Authority's and Dr. Rajput's Motion for summary judgment in the accompanying Order and deny Mr. Pipito's Motion for summary judgment. The Authority's and Dr. Rajput's July 2018 Memorandum does not restrict Mr. Pipito's right to protected speech on matters of public concern. It addresses workplace conduct with the Authority's premises. With the benefit of extensive discovery, Mr. Pipito's strained arguments based on the absence of repeating the phrase "at work" after each direction lacks merit. As both parties concede in cross-moving for summary judgment, there are no genuine issues of material fact requiring a jury evaluation. The July 2018 Memorandum addresses a public employer's confirmation of procedures in the workplace to mitigate further acrimony and grievances between Mr. Pipito and his co-workers. Even if the July 2018 Memorandum could be stretched by some objectively

34

unreasonable interpretation to affect his ability to express speech on matters of public concern, the Authority had adequate justification, Mr. Pipito admittedly lacks an injury in fact necessary for constitutional standing, Dr. Rajput is entitled to qualified immunity, and there is no basis to hold the Authority responsible under a *Monell* theory. Mr. Pipito is thus left with what he admittedly understood right after the July 2018 Memorandum: it involved disciplinary procedures at his public employment workplace. He cannot transform disciplinary steps towards public employees relating solely to pending harassment claims into a First Amendment claim.

---

[1] Our Policies require a Statement of Undisputed Material Facts ("SUMF") and an appendix in support of summary judgment. The parties prepared a Joint Appendix in support of their cross-motions for summary judgment (ECF Doc. No. 32-4 through 32-14). References to the Joint Appendix are by Bates number, for example, "1a." Defendants filed their Motion for summary judgment and supporting memorandum of law at ECF Doc. No. 32 and 32-2 and SUMF at ECF Doc. No. 32-3 ("Authority's SUMF"). Mr. Pipito filed his Motion for summary judgment and supporting memorandum of law at ECF Doc. Nos. 33, 33-1 and SUMF at 34 ("Pipito SUMF"). The Authority responded to Mr. Pipito's Motion at ECF Doc. No. 37 and to Pipito's SUMF at ECF Doc. No. 38 ("Authority's Response to SUMF"). Mr. Pipito responded to the Authority's Motion at ECF Doc. No. 39 and the Authority's SUMF at ECF Doc. No. 36 ("Pipito Response to SUMF"). The Authority filed a reply brief at ECF Doc. No. 40. Mr. Pipito attaches "exhibits" to his Response to the Authority's SUMF violating our Policies requiring all exhibits or affidavits to be included in an appendix consecutively Bates stamped.

[2] The Authority is a municipal authority organized under the laws of the Commonwealth of Pennsylvania. Pipito SUMF at ¶¶ 3, 7, 8, 9 (ECF Doc. No. 34).

[3] ECF Doc. No. 34 at ¶ 12.

[4] Joint Appendix 447a-527a (ECF Doc. No. 32-9).

[5] Authority SUMF at ¶ 76 (ECF Doc. No. 32-3).

[6] Joint Appendix 486a (ECF Doc. No. 32-9).

35

[7] *Id.* 496a-498a.

[8] *Id.*

[9] *Id.* 519a-527a.

[10] *Id.* 519a.

[11] ECF Doc. No. 32-3 at ¶ 19.

[12] *Id.* at ¶ 31. Mr. Pipito denies this asserted fact because the citation to the record cited by the Authority "does not support his factual assertion." *See* ECF Doc. No. 36 at ¶ 31. Mr. Pipito cannot, in good faith, dispute this assertion. He swore he is required to report an overflow to Mr. Rodak: "Yes. ... it's in the standard operating procedures that anything out of place or processes or mechanical failure [Mr. Rodak] needs to be notified." *See* ECF Doc. No. 32-6 at 6 (we use the pagination assigned by the CM/ECF docketing system).

[13] ECF Doc. No. 32-3 at ¶¶ 35-36. Mr. Pipito again denies this basic fact, arguing "[t]hese are not purported statements of fact based on competent record evidence. They are statements included in an arbitrator's opinion. An arbitrator's opinion does not substitute for competent record evidence." *See* ECF Doc. No. 36 at ¶¶ 34-37. Mr. Pipito's denial is improper. He fails to provide us with citations in the record contradicting the fact Mr. Rodak notified Dr. Rajput of the overflow and, at Dr. Rajput's direction, Mr. Rodak notified the Department of Environmental Protection. Federal Rule of Civil Procedure 56(c)(1) requires Mr. Pipito, as the "party asserting that a fact cannot be or is genuinely disputed," to support his assertion by "citing to particular parts or materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A), (B). He failed to do so, simply denying, with no citation to the record, somehow the arbitrator's opinion is not "competent record evidence." The arbitrator's opinion is in the record.

[14] ECF Doc. No. 32-3 at ¶ 42.

[15] *Id.* at ¶ 43.

[16] ECF Doc. No. 34 at ¶ 9. At the time of the overflow incident, Mr. Pipito served as the Shop Steward as elected by Union members in December 2013 for a three-year term. Complaint at ¶ 14 (ECF Doc. No. 1). Mr. Rodak served as Union Chairman as elected by Union members. ECF Doc. No. 32-3 at ¶¶ 65-66. In December 2016, Mr. Pipito ran for the position of Union Chairman but lost to Mr. Rodak in an election. *Id.* at ¶ 67. Mr. Pipito has not served in the position of Shop Steward since the December 2016 election. *Id.* Mr. Rodak continues to hold the position of Union Chairman at the Facility. *Id.* at ¶ 68.

36

[17] ECF Doc. No. 32-3 at ¶¶ 45-47.

[18] *Id.* at ¶¶ 48-49.

[19] *Id.* at ¶¶ 53-54.

[20] Joint Appendix 733a (ECF Doc. No. 32-14).

[21] Joint Appendix 529a-530a (ECF Doc. No. 32-9).

[22] Joint Appendix 529a (ECF Doc. No. 32-9).

[23] *Id.*

[24] *Id.* 530a.

[25] Pipito Response to SUMF at ¶¶ 105-106 (ECF Doc. No. 36); Joint Appendix at 82a (ECF Doc. No. 32-6).

[26] *Id.*

[27] Joint Appendix at 530a (ECF Doc. No.32-9).

[28] Joint Appendix 82a (ECF Doc. No. 32-6).

[29] Mr. Andrews is employed by the Authority as the engineering assistant and wastewater treatment plant manager. He is the supervisor of both Mr. Pipito and Mr. Rodak. Joint Appendix at 551a-553a (ECF Doc. No. 32-10).

[30] ECF Doc. No. 32-3 at ¶ 108.

[31] *Id.* at ¶ 123.

[32] *Id.* at ¶ 124.

[33] *Id.* at ¶ 125.

[34] Joint Appendix 547a (ECF Doc. No. 32-9).

[35] *Id.*

[36] *Id.*

[37] Joint Appendix 558a-559a (ECF Doc. No. 32-10).

[38] Joint Appendix at 90a (ECF Doc. No. 32-6). There is a dispute regarding whether Mr. Pipito made a complaint about Mr. Rodak's behavior; Mr. Pipito's notes and his deposition testimony

suggest he made an oral complaint to Mr. Andrews about Mr. Rodak but the Authority does not believe Mr. Pipito submitted a formal written complaint. *See* ECF Doc. No. 32-3 at ¶¶ 133-134.

[39] Joint Appendix at 90a (ECF Doc. No. 32-6); 559a (ECF Doc. No. 32-10).

[40] *Id.*

[41] Joint Appendix 561a-562a (ECF Doc. No. 32-10).

[42] *Id.*

[43] *Id.*

[44] ECF Doc. No. 32-3 at ¶ 147.

[45] *Id.* at ¶¶ 148-149.

[46] *Id.* at ¶¶ 151-152.

[47] Joint Appendix 564a; ECF Doc. No. 32-2 at ¶¶ 153-157.

[48] *Id.*

[49] Joint Appendix at 98a-99a (ECF Doc. No. 32-6); 677a-678a (ECF Doc. No. 32-11).

[50] ECF Doc. No. 36 at ¶¶ 153-157.

[51] ECF Doc. No. 32-2 at ¶ 158.

[52] *Id.* at ¶ 161.

[53] ECF Doc. No. 36 at ¶ 161.

[54] ECF Doc. No. 32-2 at ¶ 164.

[55] *Id.* at ¶¶ 165-170.

[56] Joint Appendix 2a (ECF Doc. No. 32-5).

[57] *Id.* (emphasis added).

[58] *Id.*

[59] *Id.*

[60] Joint Appendix 100a-102a (ECF Doc. No. 32-6).

[61] *Id.* 102a.

[62] ECF Doc. No. 32-3 at ¶ 224.

[63] *Id.* at ¶ 125.

[64] *Id.* at ¶ 126.

[65] Joint Appendix 604a-607a (ECF Doc. No. 32-10); 112a-113a (ECF Doc. No. 32-6).

[66] Joint Appendix 111a-112a (ECF Doc. No. 32-6).

[67] *Id.* 111a.

[68] ECF Doc. No. 36 at ¶ 228.

[69] Joint Appendix 126a (ECF Doc. No. 32-6).

[70] Joint Appendix 567a (ECF Doc. No. 32-10) (emphasis added). We cannot locate in the record the August 3, 2018 formal discipline referred to by Mr. Pipito.

[71] Mr. Pipito's complaint appears to plead a retaliation claim alleging the Authority and Dr. Rajput "embarked on a campaign to ruin his career, and his life" ever since his election to the Shop Steward position in December 2013 and "in their zeal for retribution they disciplined him" through the July 2018 Memorandum "in a fashion that violates [his] First Amendment rights." ECF Doc. No. 1 at ¶¶ 1, 14-18. Mr. Pipito alleges his union activity "did not sit well with management" and Dr. Rajput told him "more than once … 'the union does not run the plant, I do.'" *Id.* at ¶ 15. He also alleges the Authority "sicced the Pennsylvania Department of Environmental Protection on [him]" in August 2015 after an arbitrator "reinstated" him to his job with back pay, the Authority "coaxed" the Department of Environmental Protection to "bring charges" against him, and the "campaign of retaliation continues" through the July 2018 Memorandum. *Id.* at ¶¶ 19-22. Although Mr. Pipito appears to plead a retaliation claim for union activity, Mr. Pipito confirmed he is not pursuing a retaliation claim and clarified his action is "exclusively a case for a First Amendment violation in that the disciplinary memorandum on its face, is overbroad and unlawfully encroaches on his First Amendment rights. He does not present a claim for unlawful retaliation under any statute or Constitutional provision." ECF Doc. No. 6 at 3 nn. 2-3.

[72] ECF Doc. No. 1 at ¶¶ 26-27.

[73] *Id.*

[74] *Id.* at ¶¶ 35-38.

[75] ECF Doc. No. 32-3 at ¶¶ 237-250.

[76] *Id.*

39

[77] *Id.* at ¶ 252.

[78] *Id.* at ¶¶ 253-255. Both Mr. Pipito and Ms. Dunn took notes of the April 18, 2019 meeting. *See* Joint Appendix at 617a, 619a (ECF Doc. No. 32-10).

[79] ECF Doc. No. 32-2 at ¶ 256.

[80] Joint Appendix at 126a (ECF Doc. No. 32-2). At his May 24, 2019 deposition, Mr. Pipito testified he "tried" to contact a reporter at the Bucks County Courier Times "a few months ago." *Id.*

[81] Joint Appendix 692a (ECF Doc. No. 32-13; Dr. Rajput Declaration at ¶ 64 (ECF Doc. No. 32-13)

[82] ECF Doc. No. 36 at ¶ 213.

[83] *Id.* at ¶ 212.

[84] Joint Appendix 692a (ECF Doc. No. 32-13); Dr. Rajput Declaration at ¶ 65 (ECF Doc. NO. 32-13); Joint Appendix 569a (ECF Doc. No. 32-10).

[85] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.,* 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson*, 850 F.3d at 533-34 (3d Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-323).

"This standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Auto–Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). "When both parties

move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Auto–Owners Ins. Co.*, 835 F.3d at 402 (quoting 10A Charles Alan Wright et al., FEDERAL PRACTICE & PROCEDURE § 2720 (3d ed. 2016)).

[86] *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

[87] ECF Doc. No. 32-2. Entering summary judgment in favor of the Authority and against Mr. Pipito, we do not address the punitive damages issue.

[88] ECF Doc. No. 33-1.

[89] ECF Doc. No. 39.

[90] ECF Doc. No. 36 at ¶ 182.

[91] ECF Doc. Nos. 33, 39.

[92] ECF Doc. No. 1 at ¶¶ 26-27; ECF Doc.No. 33-1 at 6; ECF Doc. No. 39 at 5.

[93] ECF Doc. No. 33-1 at 6; ECF Doc. No. 39 at 5.

[94] *Id.*

[95] *Id.*

[96] Joint Appendix 123a (ECF Doc. No. 32-6).

[97] *Id.* 124a.

[98] *Id.*

[99] *Id.*

[100] *Id.* 124a-125a.

[101] *Id.* 125a.

[102] ECF Doc. Nos. 32, 37. The Authority's primary argument is Mr. Pipito lacks constitutional standing because there is no evidence of injury-in-fact. We address the standing issue below.

[103] *U.S. v. Nat'l Treasury Employees Union*, 513 U.S. 454, 465 (1995).

[104] *Connick v. Myers*, 461 U.S. 138, 147 (1983).

[105] *O'Donnell v. Knott*, 283 F.Supp. 3d 286, 304 (E.D. Pa. 2017) (citing *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1209 (10th Cir. 2007)).

[106] *Nat'l Treasury Employees Union*, 513 U.S. at 468.

[107] *De Ritis v. McGarrigle*, 861 F.3d 444, 452 (3d Cir. 2017) (citing *Munro v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 466 (3d Cir. 2015)).

[108] *Pickering v. Bd. of Educ. of Twp. High School Dist. 205, Wills Cnty., Illinois*, 391 U.S. 563 (1968). The *Pickering* framework, "most often applied in the retaliation context," is also applied to "assessing prospective restrictions on government employee speech." *Moonin v. Tice*, 868 F.3d 853, 861 (9th Cir. 2017) (citing *Nat'l Treasury Employees Union*, 513 U.S. at 465-68; *Gibson v. Office of Attorney Gen.*, 561 F.3d 920, 926-27 (9th Cir. 2009)).

[109] *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citing *Pickering*, 391 U.S. at 568).

[110] *Garcetti*, 547 U.S. at 418.

[111] *Garcetti*, 547 U.S. at 410 (citing *Pickering*, 391 U.S. at 568).

[112] *Connick*, 461 U.S. at 141 (footnote omitted).

[113] *Id.*, at 141.

[114] *Id.*, at 142.

[115] *Id.*, at 143.

[116] *Id.*, at 143 (footnotes omitted).

[117] *Id.* at 144-45.

[118] *Id.*, at 146 (citations omitted).

[119] *Id.*, at 147 (citation omitted).

[120] *Id.*, at 147.

[121] *Id.*, at 147-48 and n. 7. *See also*, *Munro v. Central Bucks Sch. Dist.*, 805 F.3d 454, 466 (3d Cir. 2015) (citations omitted) ("[t]he question of whether or not speech is protected by the First Amendment constitutes a question of law").

[122] ECF Doc. No. 36 at ¶¶ 105-106; Joint Appendix at 82a (ECF Doc. No. 32-6).

[123] Joint Appendix at 2a (ECF Doc. No. 32-5).

[124] Mr. Pipito makes much of our February 21, 2019 Order as having "already determined that the [July 2018 Memorandum] 'prohibits Mr. Pipito from saying or writing anything negative about his negative employees; by logical extension it also plausibly prohibits him from saying or writing

anything negative about his employer'" and as having "explained" to the Authority it "continue[s] to miss the mark as to the crux of the issue." *See* ECF Doc. No. 11 at ¶ 11; ECF Doc. No. 39 at 2. Our February 21, 2019 Order addressed the Defendants' motion to dismiss where we measured, as we must on a motion to dismiss, whether Mr. Pipito's complaint stated a plausible First Amendment claim. We are now at summary judgment and have the benefit of a full record.

[125] Joint Appendix 567a (ECF Doc. No. 32-10) (emphasis added). We cannot locate in the record the August 3, 2018 formal discipline referred to by Mr. Pipito.

[126] *Garcetti*, 547 U.S. at 420 (quoting *Connick*, 461 U.S. at 154).

[127] *Id.*, at 418.

[128] *Pickering*, 391 U.S. at 568.

[129] *Id.*

[130] *De Ritis*, 861 F.3d at 457-58 (citing *Pickering*, 391 U.S. at 573).

[131] *Munro*, 805 F.3d at 472 (quoting *Miller v. Clinton Cnty.*, 544 F.3d 542, 549 n. 2 (3d Cir. 2008)).

[132] *Id.* (quoting *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 991 (3d Cir. 2014)).

[133] *Id.*, at 472 (quoting *Miller*, 544 F.3d at 548).

[134] *Id.* (quoting *Miller*, 544 F.3d at 549 n. 2).

[135] Joint Appendix 82a (ECF Doc. No. 32-6); ECF Doc. No. 36 at ¶ 106.

[136] ECF Doc. No. 36 at ¶¶ 136-142; Joint Appendix 97a (ECF Doc. No. 32-6).

[137] Joint Appendix 612a, 614a, 615a (ECF Doc. No. 32-10); Declaration of Dr. Rajput at ¶73 (ECF Doc. No. 32-13); Joint Appendix 693a (ECF Doc. No. 32-13). Mr. Pipito denied Mr. Rodak filed a Union grievance because he has not seen it and the "jury need not believe [Dr.] Rajput." Pipito ECF Doc. No. 36 at ¶ 258.

[138] *See* Section II.B. *infra.*

[139] Pipito Declaration at ¶ 2 (ECF Doc. No. 36-3).

[140] Joint Appendix 519a (ECF Doc. No. 39-2).

[141] ECF Doc. No. 32-3 at ¶¶ 85-86; ECF Doc. No. 36 at ¶¶ 85-86.

[142] Joint Appendix 109a (ECF Doc. No. 32-6).

[143] Joint Appendix 486a (ECF Doc. No. 32-9). 43

[144] Joint Appendix 86a (ECF Doc. No. 32-6).

[145] ECF Doc. No. 1 at ¶¶ 26-27.

[146] *See* ECF Doc. No. 33-1 at 6; ECF Doc. No. 39 at 5.

[147] *United States v. Stevens*, 559 U.S. 460, 473 (2010).

[148] *United States v. Williams*, 553 U.S. 285, 292 (2008); *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 241 (3d Cir. 2010).

[149] *McCauley*, 618 F.3d at 241-42 (quoting *Williams*, 553 U.S. at 293).

[150] *Id.*, at 242 (quoting *Williams*, 533 U.S. at 297).

[151] *Id.*, at 242

[152] Defendants moved for summary judgment on Mr. Pipito's claim under the overbreadth doctrine and argued any claim under the doctrine fails both in their brief in support of summary judgment (ECF Doc. No. 32-2 at 6, n.2) and their brief in opposition to Mr. Pipito's Motion for summary judgment (ECF Doc. No. 37 at 8, n.2). Mr. Pipito did not address the overbreadth doctrine in either his moving brief or opposition brief, and abandoned any claim under the overbreadth doctrine, to the extent his complaint alleges such a claim. *See Glenn v. Raymour and Flanigan*, 832 F.Supp. 2d 539, 547 (E.D. Pa. 2011) (plaintiff abandoned harassment, hostile work environment, and retaliation claims "by failing to address them in his response to [Defendant's] motion for summary judgment") (collecting cases); *Evans v. Nine West Grp., Inc.*, No. 00-4850, 2002 WL 550477, at * 4 (E.D. Pa. Apr. 15, 2002) (finding plaintiff's claim abandoned when "not defended in her opposition to defendant's motion" for summary judgment) (collecting cases).

[153] *See* ECF Doc. No. 39.

[154] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and footnote omitted).

[155] *Id.*, at 560-61 (citation omitted).

[156] *Id.*, at 561 (citation omitted).

[157] *Laird v. Tatum*, 408 U.S. 1, 12-13 (1972) (plaintiffs challenged Department of the Army's surveillance of civilian political activity as chilling the exercise of First Amendment rights).

[158] *Id.* (citing *Ex parte Levitt*, 302 U.S. 633, 634 (1937)).

[159] *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974).

[160] *Arizona Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (citing *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965); *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)).

[161] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159-60 (2014) (quoting *Babbitt*, 442 U.S. at 298).

[162] ECF Doc. No. 33-1 at 6; ECF Doc. No. 39 at 5. Under paragraphs 1 and 2, Mr. Pipito may have "no contact whatsoever" with "Leonard Rodak except reporting problems pertaining to the plant operation" and with "Walter Appleton except in an emergency situation and/or as specified in the [Facility's Standard Operating Procedures]."

[163] ECF Doc. No. 33-1 at 6; ECF Doc. No. 39 at 5. Paragraphs 3 and 6 require Mr. Pipito to "[r]efrain from making any gesture/mocking/disparaging or derogatory remarks/rumors to or about Walter Appleton, Leonard Rodak or any other employees" and "[p]resent any [Facility] Personnel/Human Resource concerns directly to Michael Andrews, P.E., [Facility] Manager."

[164] Joint Appendix 123a (ECF Doc. No. 32-6).

[165] *Id.* 124a.

[166] *Id.*

[167] *Id.*

[168] *Id.* 124a-125a.

[169] *Id.* 125a.

[170] ECF Doc. No. 33-1 at 6-7.

[171] ECF Doc. No. 32-2 at 5-9; ECF Doc. No. 37 at 7.

[172] ECF Doc. No. 37 at 8.

[173] ECF Doc. No. 39 at 1.

[174] Memorandum at Joint Appendix 2a (ECF Doc. No. 32-5); Mr. Rodak's complaint at 528a (ECF Doc. No. 32-9); Mr. Appleton's complaint at 560a (ECF Doc. No. 32-10) (emphasis added).

[175] Joint Appendix 100a-101a (ECF Doc. No. 32-6).

[176] ECF Doc. No. 32-3 at 15 (we use the pagination assigned by the CM/ECF docketing system).

[177] Joint Appendix 101a-102a (ECF Doc. No. 32-6).

[178] *Id.* 104a.

[179] *Id.* 109a.

[180] Joint Appendix 486a (ECF Doc. No. 32-9).

[181] Joint Appendix 86a (ECF Doc. No. 32-6).

[182] *Id.* 105a.

[183] Joint Appendix 521a (ECF Doc. No. 32-9); Joint Appendix 109a-110a (ECF Doc. No. 32-6).

[184] Joint Appendix 110a (ECF Doc. No. 32-6).

[185] *Id.* 104a (ECF Doc. No. 32-6).

[186] *Id.*

[187] At Mr. Pipito's deposition, Defendants' counsel went through each of the six paragraphs in the July 2018 Memorandum and, for each paragraph, asked Mr. Pipito if he understood the directive of each paragraph to apply to the workplace. Joint Appendix 101a-105a (ECF Doc. No. 32-6). For directives 1 and 2—no contact with Mr. Rodak and Mr. Appleton, with limited exceptions— Mr. Pipito testified he agreed the directives applied to conduct at work and he understood both directives. Joint Appendix 101a. When asked by Defendants' counsel, Mr. Jones, whether he agreed the type of conduct described in directive 3—refraining from making gestures/ mocking/disparaging or derogatory remarks/ rumors about Mr. Rodak or Mr. Appleton or any other employees—applied to his conduct while in the workplace, Mr. Pipito's counsel, Mr. Weinstein, objected adding "It doesn't say that." Joint Appendix at 102a. Mr. Pipito then testified he believed the "whole memo" is "just period. It's a blanket. It's not just in the workplace. It doesn't say that it's only in the workplace. It doesn't say it's only outside the workplace." *Id.*

When Mr. Jones asked Mr. Pipito whether his testimony applied only to directive 3 because he testified he understood directives 1 and 2 applied to his conduct in the workplace, Mr. Weinstein objected to the form of the question adding "[t]hat doesn't reflect what he just testified to." *Id.* Mr. Pipito then changed his testimony after objections from his counsel such as "[t]hat's not what he [Mr. Pipito] said." *Id.*

Mr. Jones then attempted to clarify and asked Mr. Pipito:

Q: Now, you claim that the directives in the memo that we've described violate your first amendment constitutional rights to free speech. Based on what we just went through, your – the concerns that you have with items No. 1 through No. 4, correct?

Mr. Pipito did not respond, because Mr. Weinstein objected, and counsel had the following exchange on the record:

Mr. WEINSTEIN: That's not correct. It mischaracterizes his testimony. I think he's mentioned several times.

Mr. JONES: Please don't do speaking objections.

Mr. WEINSTEIN: Please don't mischaracterize –

Mr. JONES: I'm not mischaracterizing –

Mr. WEINSTEIN: He's testified several times that all of these are sweeping outside of work.

Mr. JONES: Counsel, you are coaching the witness by your objections. You can make an objection to the form of the question. And we agreed to the usual stipulations. If it turns out that my testimony is misleading – my question's misleading, you can move to strike. It won't be admissible at trial.

Mr. WEINSTEIN: Well, I need to preserve the record on questions that mischaracterize prior testimony.

Mr. JONES: And you've done that. I did not ask for a further explanation, so you can make that statement and the objection is noted, okay? But you're adding additional explanation for your objection is influencing his testimony.

Mr. WEINSTEIN: It is to preserve the integrity of the deposition. I'm going to do it, because it's fair game.

Mr. JONES: No, sir. That's a speaking objection.

Mr. WEINSTEIN: If it is mischaracterizing his testimony, then I'm going to have to object and explain the nature of the mischaracterization.

Joint Appendix 104a (ECF Doc. No. 32-6).

After this exchange, Mr. Jones asked the following questions of Mr. Pipito:

Q: Sir, your understanding of the terms of your complaint and your allegations that this memo violates your constitutional rights, are your concerns with regard to items No. 1 through 4 in memo in terms of these directives? Is that what you feel violates your rights?

A: I feel the whole memo violates my right.

Q: How?

A: It doesn't say – all it says is you're not allowed to do this.

47

Q: Well, we just went through 5 and 6, and you said 5, that you don't have an issue complying with the Authority's civility policy. Do you feel that the Authority's – complying with the Authority's civility policy violates your constitutional rights?

A: The Authority's civility policy does not violate my constitutional rights.

Q: No. 6, that directive, you do not feel that violates your constitutional rights, correct?

Before Mr. Pipito could answer, Mr. Weinstein objected and had the following exchange with Mr. Jones:

Mr. WEINSTEIN: Objection to the form of the question. It's in his complaint that he does. It's in the brief. Don't mischaracterize what –

Mr. JONES: I'm not –

Mr. WEINSTEIN: -- we've alleged.

Mr. JONES: Counsel, you're making speaking objections. You have made the objection. He can correct me if I'm wrong.

Mr. WEINSTEIN: Cecil, please don't mischaracterize what you know not to be true. You know that we've alleged in the court pleadings and arguments to the court that we had problems with No. 6 also. Please don't do that. You know what you're doing.

Mr. JONES: Counsel, you're informing the witness by your objections as to what is the basis of his complaint. It's his complaint. He can tell me that he thinks is the problem with the memo.

Mr. WEINSTEIN: Through his lawyer, you know from arguments to the court what we've said about No. 6.

Mr. JONES: Fine.

Mr. WEINSTEIN: You're trying to take advantage of a layperson.

Mr. Jones: I'm not. I'm not at all.

Joint Appendix 104a-105a.

Mr. Jones then asked Mr. Pipito to explain, in his own words, how he feels the July 2018 Memorandum violates his First Amendment rights. Mr. Pipito, after earlier testifying he did not believe the July 2018 Memorandum's directives applied outside of work, testified: "It bars me from doing or saying anything. It creates fear of losing my job again by speaking out. How could anyone agree with this? Who else walks around with a gag in their mouth not allowed to do

anything. Oh, you're not allowed to do this whether it's here or not." And when asked whether he refrained from any conduct because of the July 2018 Memorandum, Mr. Pipito answered: "I can't go to counsel. I can't go to the DEP. I can't go to the DA's office. I can't approach any political person, any agency. I'm not allowed to contact anyone." Joint Appendix 105a.

[188] Joint Appendix 105a-106a (ECF Doc. No. 32-6).

[189] *Id.* 126a.

[190] Joint Appendix 692a (ECF Doc. No. 32-13); Dr. Rajput Declaration at ¶ 65 (ECF Doc. No. 32-13); Joint Appendix 569a (ECF Doc. No. 32-10).

[191] ECF Doc. No. 32-2 at 17-20; ECF Doc. No. 37 at 21-25.

[192] *City of Escondido, Cal. v. Emmons*, --- U.S. ---, 139 S.Ct. 500, 503, 202 L.Ed.2d 455 (2019) (citations omitted).

[193] *Mullinex v. Luna*, 577 U.S. ---, ---, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

[194] *Kisela v. Hughes*, --- U.S. ---, 138 S.Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (quoting *White v. Pauly*, 580 U.S. ---, ---, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017)).

[195] *City of Escondido*, 139 S.Ct. at 503.

[196] *Mullinex*,136 S.Ct. at 308 (quoting *Malley v. Briggs*, 475 U.S. 335 (1986)).

[197] *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 762 (3d Cir. 2019).

[198] ECF Doc. No. 32-2 at 18.

[199] ECF Doc. No. 39.

[200] ECF Doc. No. 39 at 10.

[201] *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979 (3d Cir. 2014).

[202] *Dougherty*, 772 F.3d at 993 (quoting *Connick*, 461 U.S. at 142).

[203] Mr. Pipito's citation to *Mansoor v. Cnty. of Albemarle*, 124 F.Supp. 2d 367 (W.D. Va. 2000) is similarly distinguishable. There, the county police department suspended the plaintiff police officer after he spoke at a county board of supervisors meeting and conditioned his further employment on refraining from making any critical statements about any county employee at any time to any third party. *Id.* at 371. The district court, in denying defendants' motion to dismiss on qualified immunity grounds, found each defendant "should have known that imposing such

extraordinarily broad conditions upon the plaintiff's employment would preclude him from speaking as a private citizen on matters of public concern, and thus would violate well-established First Amendment law." *Id.* at 379. Mr. Pipito's citation to *Doe v. Broderick*, 225 F.3d 440 (4ᵗʰ Cir. 2000) is also inapposite. In that case, the United States Court of Appeals for the Fourth Circuit affirmed the district court's denial of a police detective's motion for qualified immunity where he entered the file room of a substance abuse treatment clinic, without probable cause, and searched the plaintiff's confidential treatment records as well as records of other patients, in the hopes the search may establish the identity of a suspected robber. The court of appeals found, as of the time of the detective's action, it was clearly established "law enforcement officials were not free to barge into an area within a place of business where the public was not invited and over the objection of the proprietors conduct a general search for evidence of a crime without the slightest hint of probable cause." *Id.* at 453. *Broderick*, considering qualified immunity in a Fourth Amendment case regarding clearly established rights to be free from search in the absence of a warrant based on probable cause, does nothing to advance Mr. Pipito's clearly established argument in the context of his First Amendment claims.

[204] Because we find Dr. Rajput is entitled to qualified immunity, we need not address his argument consultation with Solicitor Downey creates a presumption of qualified immunity, citing *Kelly v. Borough of Carlisle*, 622 F.3d 248 (3d Cir. 2010). *See* ECF Doc. No. 32-2 at 26 (we use the pagination assigned to the document by the CM/ECF docketing system).

[205] *Mulholland v. Gov. Cnty. of Berks, Pa.*, 706 F.3d 227, 237 (3d Cir. 2013).

[206] *Id.* (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)).

[207] *Forrest v. Parry*, --- F.3d ---, 2019 WL 2998601, at *7 (3d Cir. July 10, 2019).

[208] *Estate of Roman*, 914 F.3d at 798 (citations omitted).

[209] *Id.* (internal citations omitted).